

**NUMBER 13-07-00404-CR**

**COURT OF APPEALS**

**THIRTEENTH DISTRICT OF TEXAS**

**CORPUS CHRISTI - EDINBURG**

---

**RICHARD ESPINOSA,**                                                    **Appellant,**

**v.**

**THE STATE OF TEXAS,**                                                  **Appellee.**

---

**On appeal from the 319th District Court
of Nueces County, Texas.**

---

**O P I N I O N**

**Before Justices Yañez, Rodriguez, and Benavides
Opinion by Justice Benavides**

On June 8, 2007, a jury found Richard Espinosa, appellant, guilty of aggravated assault on a peace officer (count one), assault on a public servant (count two), and "attempting to take weapon from a police officer" (count three). *See* TEX. PENAL CODE ANN. § 22.01(b) (Vernon Supp. 2009) (assault on a public servant), § 22.02(b)(2)(B) (Vernon Supp. 2009) (aggravated assault on a public servant), § 38.14(b) (Vernon Supp. 2009) (attempting to take weapon from peace officer). The trial court assessed punishment as

follows: on count one, life imprisonment in the Texas Department of Criminal Justice-Institutional Division ("TDCJ-ID"); on count two, ten years' imprisonment in TDCJ-ID; and on count three, two years' imprisonment in the Texas Department of Criminal Justice-State Jail Division. The sentences are to run concurrently.

On appeal, Espinosa raises five issues, which can be more properly characterized as three:[1] (1) the trial court abused its discretion by failing to grant a mistrial after false testimony was presented to the jury, and the use of such false and perjured testimony violated his due process and due course of law rights; (2) Espinosa's due process rights were violated when testimony from a prior, separate, and unrelated competency hearing was admitted during the guilt/innocence phase of the underlying trial; and (3) during the guilt/innocence phase, the trial court abused its discretion by allowing testimony that Espinosa is on pretrial supervision in a separate and unrelated case. We affirm.

## I. BACKGROUND

On August 7, 2005, Espinosa was driving a car near the Padre Staples Mall in Corpus Christi, Nueces County, Texas. Richard Perez, an officer with the Corpus Christi Police Department, was stopped at a stop light near the mall. While Officer Perez was stopped at the light, Espinosa rammed his vehicle into the back of Officer Perez's police car. Officer Perez then saw Espinosa back his car up and ram the police car again. Officer Perez noticed Espinosa attempting to back his car up a second time, but the car was embedded under the police car's rear bumper and Espinosa was unable to dislodge his vehicle. Looking in his rearview mirror, Officer Perez saw that Espinosa appeared to have "been on drugs, awake for days."

Officer Perez called police dispatch and then exited his vehicle. Once he exited his

---

[1] In his brief to this Court, Espinosa addresses his first and second issues as one issue; we will do the same in this opinion, and we will include his third issue as part of our discussion of his first two.

2

vehicle, he was able to see inside Espinosa's car, where he saw Espinosa "screaming and yelling," but he could not hear what was being said. Espinosa exited his own vehicle, started "waving his arms in the air," and ran at Officer Perez at a "full sprint." Espinosa was yelling, "Kill me, motherf*****. Kill me." Espinosa then "swung several times with both of his fists" and struck Officer Perez several times in the shoulder area. Espinosa grabbed hold of Officer Perez's protective vest and pulled him to the ground. While they were wrestling on the ground, Espinosa attempted to grab Officer Perez's firearm. Officer Perez was eventually able to push Espinosa off and spray him in the face with pepper spray. After deploying the pepper spray, Officer Perez was able to wrestle Espinosa off of him, and with the help of an unidentified passerby, he was able to handcuff Espinosa. Another officer arrived at the scene and placed Espinosa in the back of Officer Perez's vehicle. Espinosa was arrested and indicted on three counts: aggravated assault on a peace officer (count one), assault on a public servant (count two), and "attempting to take weapon from a police officer" (count three). *See* TEX. PENAL CODE ANN. § 22.01(b), § 22.02(b)(2)(B), § 38.14(b).

Dr. Joel Kutnick, the court-appointed psychiatrist, initially determined that Espinosa was incompetent to stand trial. Upon the trial court's order, Espinosa was placed in the care of Vernon's State Hospital, in Vernon, Texas. Eventually, the staff at Vernon's State Hospital determined that Espinosa had become competent to stand trial, and on May 8, 2007, a jury trial was held to resolve the competency issue. The jury determined that Espinosa was competent to stand trial.

During the trial on the merits, the only contested issue was whether Espinosa was legally insane at the time of the incident. Espinosa presented the testimony of his mother, father, and sister, all of whom confirmed that Espinosa engaged in very bizarre behavior,

including changing his name to emulate a rock star; painting his fingernails; having difficulty getting along with others; living in a home in total disarray with Arabic writings all over the walls; and dressing as a Catholic priest, then in military fatigues, wearing a beret, then as a Buddhist or Hindu priest, and then as a naval officer.

Espinosa also called Dr. Kutnick to the stand, and he testified that, among other things, Espinosa is schizophrenic and bi-polar. Dr. Kutnick stated that Espinosa told him during his initial evaluation that a microchip had been implanted in his brain while he was in the Navy and that he was able to communicate with Condoleeza Rice and Donald Rumsfeld. Espinosa told Dr. Kutnick that, while he was communicating with Rice and Rumsfeld, his foot got stuck on the accelerator, causing him to smash into Officer Perez. Initially, Espinosa would not answer Dr. Kutnick's question regarding why he attacked Officer Perez outside of the vehicles, but he later admitted that he did not remember attacking Officer Perez. Dr. Kutnick believed that Espinosa had a delusional belief system, at least as far as the purported microchip was concerned.

Dr. Kutnick also discussed his second evaluation of Espinosa, during which Espinosa offered at least one more theory to explain why he ran into the back of Officer Perez's car. Espinosa claimed that he rammed Officer Perez because he wanted to get help and get Perez's attention "because he needed to tell somebody about the microchip in his brain." Espinosa then began discussing that he was in a rage, and that is why he hit Officer Perez's vehicle. From his conversations with Espinosa and his reading of the various police reports, Dr. Kutnick surmised that the rage stemmed from either a recent breakup with a girlfriend or from a previous arrest. Dr. Kutnick believed that Espinosa was a malingerer, or someone who is "consciously deceptive. In lay terms, lies." Dr. Kutnick

4

testified that the "rage theory" was the most likely explanation for Espinosa's actions towards Officer Perez, and therefore, in his opinion, Espinosa was sane at the time of the accident.

Dr. Robert Jimenez, a psychiatrist, testified on Espinosa's behalf. Dr. Jimenez met with Espinosa at the Nueces County jail for about two hours and also spent time with Espinosa's family. He examined Espinosa's house and Espinosa's medical records. Dr. Jimenez diagnosed Espinosa as having "[c]hronic schizophrenia, paranoid type," which "is a very major disabling disease of the mind, and the brain." "[B]asically what it affects in the brain is the ability to live in reality. They cannot test reality. They live in another world[;] . . . [t]hey have this fantasy world where it operates often . . . based on their delusions and their beliefs . . . ." Dr. Jimenez testified about Espinosa's strange behavior and medical history, which dated back to high school and included various diagnoses such as schizoid disorder, schizoaffective, bipolar, and schizophrenia. Espinosa was prescribed myriad medications, including anti-psychotics, lithium, and mood stabilizers. Dr. Jimenez explained that the various diagnoses are a result of Espinosa being a paranoid schizophrenic:

> [I]t is exceedingly difficult to know what's going on with that individual [sic], especially if they're bright. Because they view the world very differently, and have suspicions of the outside world and others, and they live in ths private fantasy world that they don't share with anyone, and they develop a way of dealing with other people in the outside world that we call a false self. You know, that is that it's a put on. It's kind of like a veneer of a personality that they adapt, and that personality is like a chameleon. You know, it can change depending on where they find themselves and who they're talking to, and under what circumstances.

Dr. Jimenez also discussed his opinion regarding Dr. Kutnick's "rage theory," stating:

> Well, I would think that he [Espinosa] would have to know this man [Officer Perez] that he smashed into and have a particular reason why he smashed

5

into and have a particular reason why he would want to hurt this particular individual, and a history of [his] having done rageful things of this nature; attacked other people, you know, with automobiles being used as a weapon. If you had a pattern there and he knew this person and wanted to go after him, that would be understandable. But as far as I'm aware, he didn't know who this police officer was, and—there's no pattern of [him] doing these sort of things in the past. So I—I don't see any evidence or rage theory, but—

Espinosa's counsel then asked, "One of the theories was that maybe—you know, because Richard Espinosa had been arrested before . . . . That maybe he was mad at the police officers because he had been arrested before." Dr. Jimenez responded, "Well, people get arrested all the time . . . for traffic tickets and all . . . and they don't want to smash into police officers. I mean, this is rare. This is weird. And it doesn't make any sense . . . . You just don't see this kind of thing."

Regarding the events in the underlying case, Dr. Jimenez stated:

Well, the—the way that he explained to me the events of that particular day is that he had been going through these bizarre episodes in his house where he would smash the windows and write inscriptions and smash furniture and do all kinds of things in his house. And he claims he was being controlled by these chips[,] and he would sort of go mad[,] and this was the reason he didn't get out of his house and didn't go anywhere. And that particular day he seemed to be free of some of these episodes, and he got into his car and began to drive around. And he contends that he started feeling these—the actions of the chip again; namely, the tremors inside his body, and he [became] angry and upset and enraged, and then he doesn't really recall all the details of what happened after that until he was told later, you know, of the events. And he is convinced that he was operating under the control of these alien forces through these chips, you know, when he did what he allegedly did. And in his view, he didn't do it, you know. It was done by people who were controlling his brain. They did it, and not him.

. . . .

In my medical opinion, in terms of probability, it is my view that Mr. Espinosa has been—you know, fits the definition of insanity prior to the incident, during the incident, and subsequently after the incident, and things have not really changed that much for him. It is my view that he was operating under this delusional system that I mentioned at the time of the crime, that it was part and a response to that delusional system, and therefore he didn't have moral

6

culpability.

After hearing this testimony and the testimony of Espinosa's family and other witnesses, the jury found Espinosa guilty on all three counts in the indictment. The trial court assessed punishment, and this appeal ensued.

## II. FALSE AND PERJURED TESTIMONY

In his first issue, Espinosa claims that the trial court abused its discretion by not granting a mistrial when Dr. Kutnick testified regarding Espinosa's prior arrest and that the State violated his due process and due course of law rights when it used such false and perjured testimony.[2] *See Ex parte Castellano*, 863 S.W.2d 476, 481 (Tex. Crim. App. 1993) (en banc) ("To summarize, the State violates a defendant's rights to due process when it actively or passively use[s] perjured testimony to obtain a conviction."). Espinosa asserts that he was never actually arrested on the prior offense, even though he had been indicted and arraigned.

## A.    Applicable Law

We review a trial court's denial of a motion for mistrial under an abuse of discretion standard. *Yates v. State*, 171 S.W.3d 215, 220 (Tex. App.–Houston [1st Dist.] 2005, pet. ref'd) (citing *Ladd v. State*, 3 S.W.3d 547, 567 (Tex. Crim. App. 1999)). We "must uphold

---

[2] The State asserts that Espinosa failed to properly preserve this issue for our review, contending that his motion for mistrial was neither timely nor specific. *See Griggs v. State*, 213 S.W.3d 923, 927 (Tex. Crim. App. 2007). Espinosa moved for a mistrial during and after Dr. Jimenez's testimony and after the testimony of his rebuttal witness, Jason Lucas. Lucas followed immediately after Dr. Kutnick's rebuttal testimony, and both of these two witnesses discussed the situation concerning Espinosa's prior offense. In response, Espinosa asserts that his motion following Lucas and Dr. Kutnick was timely because he did not learn of the full circumstances surrounding the prior offense until after Dr. Kutnick first testified as Espinosa's own witness. During the hearing on his motion, Espinosa argued that it should be granted because allowing Dr. Kutnick to testify that Espinosa had been "arrested" was "improper" because according to Espinosa, it was not true, and because such testimony was "highly prejudicial." Because "appellate courts should reach the merits of an appeal whenever reasonably possible," we conclude that, under the circumstances of this case, Espinosa's motion for mistrial was timely and specific; therefore, he did not waive this issue. *Perry v. Cohen*, 272 S.W.3d 585, 587 (Tex. 2008).

7

the trial court's ruling if that ruling was within the zone of reasonable disagreement." *Wead v. State*, 129 S.W.3d 126, 129 (Tex. Crim. App. 2004) (citing *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1990) (op. on reh'g)). Under this standard of review, in the instant case, "[w]e review the record to determine if the State 'used' the testimony, whether the testimony was 'false,' whether the testimony was 'knowingly used,' and if these questions are affirmatively answered, whether there is a reasonable likelihood that the false testimony could have affected the judgment of the jury." *Ramirez v. State*, 93 S.W.3d 386, 394-95 (Tex. App.–Austin 2002, pet. ref'd).

> There is no need for a defendant to show the witness knew the testimony was false or otherwise harbored a sufficient culpable mental state to render the witness subject to prosecution for perjury. Moreover, the Court of Criminal Appeals has made clear that whether the rule is violated or not does not depend upon the defendant's ability to demonstrate the witness's specific factual assertions were technically incorrect or "false." It is sufficient if the witness's testimony gives the trier of fact a false impression.

*Id.* at 395 (quoting 42 George E. Dix & Robert O. Dawson, Texas Practice: Criminal Practice and Procedure § 22.53 (2d ed. 2002)).

## B.    Discussion

Espinosa contends that Dr. Kutnick's testimony that his prior arrest caused him to be in a rage during the confrontation with Officer Perez is the only testimony that Espinosa was sane at the time he collided with Officer Perez.[3] Espinosa asserts that he was never "arrested" for the prior offense, and argues that because he was never arrested, Dr. Kutnick's testimony was false and misleading to the jury. We disagree that Dr. Kutnick's testimony was false or misleading.

At the outset, we note that Espinosa called Dr. Kutnick as a witness and the

---

[3] Nina Espinosa, Espinosa's mother, stated several times during cross-examination that Espinosa knew right from wrong on the day of the accident, at least insofar as he knew that he must obey traffic laws.

testimony regarding the prior arrest came in during Espinosa's *direct* examination of Dr. Kutnick. While Dr. Kutnick was being questioned by Espinosa, a bench conference occurred outside of the presence of the jury to discuss the confines of Dr. Kutnick's testimony regarding his theory that Espinosa acted out of rage due to the prior arrest. Espinosa's counsel agreed that Dr. Kutnick could testify regarding the rage theory so long as Dr. Kutnick did not mention what the prior offense was and avoided mentioning any details of the offense. Following the bench conference, Espinosa's counsel prompted Dr. Kutnick to continue discussing the rage theory. Dr. Kutnick testified as follows:

> So as I'm trying to, as I said, determine if a person is insane, I'm trying to reconstruct the events. One, do they have a mental illness? Yes, he has a mental illness that could so confuse him. But did it? And so[,] essentially in the two interviews I had[,] I got three different explanations from him as to what happened. One, his accelerator got stuck on the pedal because he was hearing the government officials. The second explanation was [that] he hit the officer because he wanted to get attention and get this microchip out of [his] head.
>
> And the—and he also started talking about that he had broken up with his girlfriend and he—this anger was building up in him, the rage. But I also knew from all of the documents handed to me that he had previously been arrested a few months ago. And he started talking about this rage. And he also told me that he didn't—he denied that the police officer implanted chips in his head so that the rage didn't come from there, and I began to speculate, well, was he angry at police officers because he got arrested previously[,] and he saw the cop and hit him[?]
>
> Now, out of those three explanations, at least the facts as I know it, the rage issue makes the most sense. So he hit the officer[,] backed up, hit him again, then attacked him. That is rage. He doesn't shout to the officer, at least as far as I know, please help me. I have a microchip, you know. Why would you attack the officer if you're saying you want help[?]
>
> So as I look at it, at least as much as I know about what happened, it's the rage reaction that seems to be—explained the actions that night[,] and [they did] not have anything to do with this microchip.
>
> And again, as I said, literally over the years I've done thousands of these cases[,] and when I found somebody to be insane, and I have, what

they told me also fit the facts of the case. As an example, I declared a person insane. He had stabbed two women to death in the hospital here. This was two years ago. Because he thought they were witches and put a hex on him [sic]. And the nurses came as he was stabbing them[,] and he shouts to the nurses, "Look what happens to witches." He doesn't run away. The security officer at the hospital, he gives the guy the knife, and he doesn't try to escape. The police come, he tells them that "I killed the witches," and he doesn't deny it. All that fits, you know. But he actually believed they were witches. And, I mean, a terrible tragedy happened, but it all fits the facts of what happened.

With Mr. Espinosa, the only explanation so far that I know of that fits the facts is the rage, and rage is not—in my opinion, does not mean a person is insane. Now, if it was rage over the police putting the microchip in his head, yeah. But he denies that the police had anything to do with the planting of the micro—and that's why—although I do think he's ill—why I don't think he meets the insanity definition[,] which says that your thinking has to be so distorted by your illness that you do not know that it's wrong.

And he also told me that he hit the police car because he knew that he would be arrested, and that of course suggests that he understood that it was wrong. So people can be sick, but [that doesn't] necessarily mean that they're actually insane, according to the definition of the State of Texas.

Later during Espinosa's direct examination, he asked Dr. Kutnick to confirm that his conclusion that Espinosa was sane was based on Espinosa's rage over his prior arrest. At no point during his direct examination of Dr. Kutnick did Espinosa object to the testimony or ask the trial court to instruct the jury to disregard the testimony on the grounds that Espinosa had not previously been arrested. In fact, when Dr. Kutnick was called by the State as a rebuttal witness later in the trial, the following discussion occurred:

| [Espinosa's Counsel]: | Okay. Well, do you know when he was arrested by the police? |
|---|---|
| Dr. Kutnick: | I'd have to look [it] up. I don't know—I don't remember the exact date. It's— |
| Counsel: | Or do you even know if he was arrested by the police? |
| Dr. Kutnick: | Well, I know he has a charge. |

10

| Counsel: | Do you know if he was arrested or if his lawyer turned him in? |
| --- | --- |
| Dr. Kutnick: | I don't know the exact circumstances of that previous charge. |

The first time Espinosa explicitly asserted that he had not actually been arrested for the prior offense was during the testimony of his rebuttal witness, James Lucas, one of his defense attorneys on the prior offense. Lucas stated that his co-counsel "walked [Espinosa] up to the [trial court] when they found out there was an indictment." Lucas further testified that when his co-counsel walked Espinosa into the court for the arraignment on the prior offense, Espinosa

> was in civilian clothes, so he wasn't under arrest, and had a religious book with him[,] and he was asking me and [his co-defense counsel] if he could bring it into the courtroom. So I don't believe he was under—technical arrest, yes. There was an indictment, there was an indictment.

After stating that Espinosa "obtained a bond" at the arraignment, Lucas indicated that Espinosa was not free to leave at that time, noting, "Well, I mean, I think you have to technically go down to the jail still and process. I mean, there's still some—there's this legal fiction of an arrest, but there's not what the common person thinks of custody." This testimony is the only evidence in the record specifically detailing the events surrounding the arraignment on the prior offense.

"'[I]t it is not the actual, physical taking into custody that will constitute an arrest. An arrest is complete whenever a person's liberty of movement is restricted or restrained.'" *Medford v. State*, 13 S.W.3d 769, 773 (Tex. Crim. App. 2000) (quoting *Hardinge v. State*, 500 S.W.2d 870, 873 (Tex. Crim. App.1973)). "An arrest of a person carries with it an element of detention, custody or control of the accused . . . ." *Id.* (quoting *Smith v. State*,

153 Tex. Crim. 230, 219 S.W.2d 454, 456 (1949)).  While Espinosa may not have been handcuffed by a peace officer and led into the court in a "perp walk," that is not required for an arrest to have occurred in this case.  Here, the jury heard Espinosa's own defense counsel testify that Espinosa was indicted, arraigned and subject to a "legal fiction of an arrest."  As Lucas noted, Espinosa was not free to leave upon obtaining a bond at the arraignment; he had to "go down to the jail still and process."  We conclude that Dr. Kutnick's testimony was neither false, misleading to the jury, nor perjurious; thus, the trial court's decision is within the zone of reasonable disagreement.  *See Wead*, 129 S.W.3d at 129.  Because the trial court did not abuse its discretion, Espinosa's first, second and third issues are overruled.

### III.  TESTIMONY FROM PRIOR COMPETENCY HEARING

In his second appellate issue, Espinosa argues that he "was denied due process of law under the United States Constitution and due course of law under the Texas Constitution because he relied on the protection of article 46.02 [section] 3(g), Texas Code of Criminal Procedure, and such protection was not afforded to him."  Espinosa notes that he is raising this issue for the first time on appeal.[4]  *See* TEX. R. APP. P. 33.1.  We conclude that no violation of the statute occurred.

Article 46B.007 of the code of criminal procedure provides:

---

[4] We note that article 46.02 of the code of criminal procedure was repealed effective January 1, 2004. *See* Act of Apr. 30, 2003, 78th R.S., ch. 35, § 15, 2003 TEX. SESS. LAW SERV. 57, 72 (Vernon).  *But see* TEX. CODE CRIM. PROC. ANN. art. 46B.007 (Vernon 2006) (containing protections of privacy of competency hearings similar to former article 46.02); *Mitten v. State*, 145 S.W.3d 225, 227-28 (Tex. Crim. App. 2004) (recognizing that article 46B.007's prohibitions are more broad than those contained in article 46.02).  The court of criminal appeals has held that admitting such statements is "clearly error" and that "the error cannot be waived because the statute is too clear and absolute to be held subject to waiver." *Caballero v. State*, 587 S.W.2d 741, 743 (Tex. Crim. App. 1979).  Espinosa did not reply to the State's waiver arguments, but because we conclude that no violation of the statute occurred, we do not address the State's waiver assertions.  *See* TEX. R. APP. P. 47.1.

12

A statement made by a defendant during an examination or trial on the defendant's incompetency, the testimony of an expert based on that statement, and evidence obtained as a result of that statement may not be admitted in evidence against the defendant in any criminal proceeding, other than at: (1) a trial on the defendant's incompetency; or (2) any proceeding at which the defendant first introduces into evidence a statement, testimony, or evidence described by this article.

TEX. CODE CRIM. PROC. ANN. art. 46B.007 (Vernon 2006). The record includes testimony that Espinosa had been found competent to stand trial in a separate and unrelated case but does not contain any statements made by Espinosa, expert testimony based on any such statements, or any evidence obtained as a result of any statements made during the competency hearing in that separate case. Further, Espinosa's argument does not direct us to any statements, testimony, or evidence prohibited by article 46B.007. *See* TEX. R. APP. P. 38.1(i). Because no violation of the applicable statute occurred, we overrule Espinosa's second issue.

### IV. PRETRIAL SUPERVISION

Espinosa argues, in his third issue, that the trial court erred in admitting evidence that he "was on pretrial supervision for a pending felony in order for the State to prove [his] 'motive' for committing the indicted offense." During a pretrial conference, the trial court overruled Espinosa's objections to the admissibility of evidence that he had been on pretrial supervision in a separate and unrelated case. *See* TEX. R. EVID. 103 (stating that when the court, outside the jury's presence, rules on the admissibility of evidence, repeating the objections when the evidence is later introduced is unnecessary to preserve the issue for appellate review). Espinosa objected to the admission of his pretrial supervision under rules 401, 402, 403, and 404 of the Texas Rules of Evidence. *See id.* 401, 402, 403, 404. The trial court overruled the objections, but limited the State to

13

discussing only the fact that Espinosa had been on pretrial supervision in a separate case and forbade the State from introducing the charge or substance of that case.[5]

To determine whether the trial court erred in admitting evidence, we review its decision for an abuse of discretion. *Trevino v. State*, 228 S.W.3d 729, 734 (Tex. App.—Corpus Christi 2006, pet. ref'd) (citing *McDonald v. State*, 179 S.W.3d 571, 576 (Tex. Crim. App. 2005)). "A trial court abuses its discretion when its decision is so clearly wrong as to lie outside that zone within which reasonable persons might disagree." *Id.* (citing *Montgomery*, 810 S.W.2d at 391).

Under rules 401 and 402, relevant evidence is admissible. TEX. R. EVID. 401, 402. Rule 404(b) prohibits the admission of other crimes "to prove the character of a person in order to show action in conformity therewith," but such evidence is admissible for other purposes, including to show motive. *Id.* 404(b). However, even if admissible under rule 404(b), evidence of other crimes may still be inadmissible under rule 403 "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . . ." *Id.* 403. Additionally, "extraneous-offense evidence may be admissible when a defendant raises an affirmative defense or a defensive issue that negates one of the elements of the crime." *Berry v. State*, 233 S.W.3d 847, 858 (Tex. Crim. App. 2007). Further, "[r]ule 403 favors admissibility of relevant evidence, and the presumption is that relevant evidence will be more probative than prejudicial." *Montgomery v. State*, 810 S.W.2d at 389. Thus,

> when undertaking a Rule 403 analysis, [the trial court] must balance (1) the inherent probative force of the proffered item of evidence along with (2) the proponent's need for that evidence against (3) any tendency of the evidence

---

[5] The trial court also included a limiting instruction in the charge informing the jury that it was to only consider evidence of the extraneous offense, if it chose to consider it at all, for the purposes of evaluating Espinosa's motive for committing the indicted offenses.

to suggest decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted

*Gigliobianco v. State*, 210 S.W.3d 637, 641-42 (Tex. Crim. App. 2006).

In the present case, the fact that Espinosa committed the offenses at issue was not disputed, so the only real issue at trial was Espinosa's affirmative defense that he was insane at the time the event occurred. The State argued two theories relevant to our discussion of the extraneous offense evidence: (1) Espinosa had been found competent to stand trial in the separate case and therefore was motivated to commit an outrageous act to rebut the finding of competence, and (2) as Dr. Kutnick testified, Espinosa was angry at the police for the prior arrest. Espinosa asserts that this evidence was irrelevant and that its probative value was outweighed by the danger of unfair prejudice. We disagree.

Evidence of extraneous offenses "may be admissible when it is relevant to a noncharacter conformity fact of consequence in the case, such as rebutting a defensive theory." *Powell v. State*, 63 S.W.3d 435, 438 (Tex. Crim. App. 2001). Here, the State offered evidence of Espinosa's pretrial supervision through the testimony of Bryan Garcia, a Nueces County probation officer. It further offered evidence that Espinosa had been found competent to stand trial in the separate case through the testimony of Melinda Molina, a Nueces County district court clerk. Garcia stated that he was Espinosa's pretrial supervision officer and that as recently as three days before the underlying events occurred, Espinosa was not acting crazy or bizarre. Molina noted the court-appointed psychologist in the separate case found Espinosa competent to stand trial in that case and that a status hearing had been set. We conclude that the trial court could have reasonably

15

determined that the testimony about Espinosa's pretrial supervision and about his having been found competent to stand trial in the separate case was relevant rebuttal testimony that Espinosa was motivated to commit the underlying offenses to show that he was not competent to stand trial in the other case. *See id.*

Reviewing the rule 403 balancing test, we believe that the trial court could have reasonably concluded that evidence that Espinosa was on pretrial supervision in a separate case in which he had been found competent to stand trial was probative in determining his motive for committing the offenses before us and, as such, was needed by the State to rebut Espinosa's theory that he was insane at the time the underlying events occurred. Additionally, the trial court took care to exclude any mention of the specific offense with which Espinosa had been charged in the separate case, which protected the jury from deciding the present case on an improper basis. *See Gigliobianco*, 210 S.W.3d at 641 (explaining that the phrase "unfair prejudice" in rule 403 "refers to a tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one. Evidence might be unfairly prejudicial if, for example, it arouses the jury's hostility or sympathy for one side without regard to the logical probative force of the evidence.") (internal citations omitted). Further, there is no indication in the record that the evidence of pretrial supervision would confuse or distract the jury from the main issue of insanity or that the jury would give undue weight to the testimony, and the testimony was not cumulative, nor did it take an inordinate amount of time to present. *See id.* We conclude, therefore, that the trial court's decision to admit the testimony concerning Espinosa's pretrial supervision was within the zone of reasonable disagreement, and the trial court did not abuse its discretion in admitting this evidence. *See Wead*, 129 S.W.3d

16

at 129.  We overrule Espinosa's third issue.

## V. Conclusion

Having overruled Espinosa's first, second, and third appellate issues, we affirm the

judgment of the trial court.

_____

                                           _____
<br>
                                           GINA M. BENAVIDES
<br>
                                           Justice

Publish.
Tex. R. App. P. 47.2(b)

Dissenting Opinion by
Justice Linda Reyna Yañez.

Delivered and filed the
5th day of August, 2010.